IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| ALEX ADAMS, #1181239 | § | |
| VS. | § | CIVIL ACTION NO. 6:20cv11 |
| ASHLEE CANTWELL | § | |

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

Plaintiff Alex Adams, a prisoner currently confined at Coffield Unit within the Texas Department of Criminal Justice (TDCJ) proceeding *pro se* and *in forma pauperis*, filed this civil rights lawsuit pursuant to 42 U.S.C. § 1983 alleging purported violations of his constitutional rights.  The case was referred to the undersigned United States Magistrate Judge for findings of fact, conclusions of law, and recommendations for the disposition of the case.

The remaining claim in this lawsuit is Plaintiff's allegation that Defendant Cantwell violated his constitutional rights through excessive force. The present Report concerns the parties' respective motions for summary judgment, (Dkt. ##55, 61). For reasons explained below, the Court recommends that Defendant Cantwell's motion be granted and that Plaintiff Adams's civil rights lawsuit be dismissed.

**I. Plaintiff's Amended Complaint**

The operative complaint in this lawsuit is Plaintiff's amended complaint, (Dkt. #7). An amended complaint entirely supersedes and takes the place of an original complaint.  *See Clark v. Tarrant Cnty., Tx.*, 798 F.2d 736, 740 (5th Cir. 1986). Plaintiff alleges that Defendant Cantwell "made [a] false claim I beat her beyond first aid and admitted to pushing and punching me at hearing for disciplinary case #20200056706." (Dkt. #7, pg. 3).

1

Specifically, Adams alleges that, on October 25, 2019, he was subjected to an unconstitutional use of force while housed at the Michael Unit. He explains that "cameras will show" that he was "pushed in the cell and beaten," suffering injuries "beyond first aid." *Id.* at pg. 5. Plaintiff asserts that he suffered a broken tooth, a cut under his chin, and "a lot of nerve pain" in his face. *Id.* Prison medical staff pulled his broken tooth but Adams complaints they waited five days before doing so. Adams contends that prison officials failed to follow their own rules concerning uses-of-force despite the TDCJ policy's "being clear."

Adams states that Defendant Cantwell suffered no injuries from the incident and is making a false claim against him—amounting to "official oppression." He seeks release from administrative segregation, monetary damages, and policy changes.

## II. Defendant Cantwell's Motion for Summary Judgment

In her motion for summary judgment, (Dkt. #55), Cantwell argues that summary judgment is appropriate because there are no genuine issues of material fact regarding her entitlement to qualified immunity. Cantwell further contends that "Adams cannot and did not establish that force was applied by [Cantwell] maliciously and sadistically for the very purpose of causing harm," (Dkt. #55, pg. 2).

## III. Plaintiff Adams's Motion for Summary Judgment/Response

Adams first contends in his motion/response, (Dkt. #61), that prison officials failed to follow use-of-force policies. He further states that "upon review of the camera it is Sgt. Afu and I whom have an altercation after he pushes me into cell." He contends that the surveillance camera was purposely placed "farthest away instead of right in front of cell," (Dkt. #61, pg. 1). Adams says that the camera shows that Cantwell "did not follow policy" and shows "Sgt. Afu pushin[g] me into that cell and it shows that more [than] Cantwell, Sgt. Sweat, and Sft. Afu assaulted me."

2

Moreover, Adams insists that the surveillance video shows that he "did nothing wrong" and that staff started the entire problem. In response to Cantwell's contention that Adams pulled her hair during the incident, Adams explains that her "hair is not even seen being needed to be redone," (Dkt. #61, pg. 2).

**IV. Summary Judgment Evidence**

Defendant Cantwell attached three exhibits to her motion for summary judgment:

> **Exhibit A: Use of Force Report, with supporting business record affidavit [Bates Nos. 153-202];**
>
> **Exhibit B: Surveillance Video, with supporting business record affidavit [Bates Nos. 229]; and**
>
> **Exhibit C: Relevant portions of Plaintiff Adams['s] Medical Records [Bates No. 147 – 149].**

Adams did not attach any evidence in support of his motion, (Dkt. #61).

<u>1. Use-of-Force Report</u>

The Use-of-Force Report shows that, on October 25, 2019, at the Michael Unit 3 Building C-Pod, cell number 58, Adams "did intentionally pull away from staff in an attempt to prevent the application of hand restraints, thus resulting in a use of force, in that officers utilized the minimum amount of force to gain compliance from said offender," (Dkt. #55, pg. id. #50). Captain Michael Bustos provided a detailed summary of the incident, which reads as follows:

> On the date of 10/25/2019 and at approximately 1122 am, Offender Adams, Alex TDCJ #1181239 was ordered by Correctional Officer IV Cantwell, Ashlee to pack his property from 3 building C pod 58 cell, to move to another cell. Offender Adams refused all orders to step into his cell and pack his property. Officer Cantwell gave the offender multiple orders to step into his cell, and warned Offender Adams of the consequences to include chemical agents. Officer Cantwell called for additional staff, a supervisor, and a camera operator to her location. Prior to the additional staff arriving[,] Officer Cantwell attempted to calm the offender and place him in hand restraints. Offender Adams refused all orders. Correctional Officer V Davis, Brandi, and Sergeant Afun, Victor arrived on scene. Sgt. Afun ordered offender Adams to submit to hand restraints and Offender Adams refused. Sgt. Afun attempted to place the offender's hands behind his back and place him in hand

restraints. Offender Adams pulled away and began to assault staff by striking Officer Davis, Officer Cantwell, and Sgt. Afun with closed fists. Offender Adams also grabbed Officer Cantwell's hair and proceeded to strike her in the face multiple times. Sergeant Sweat, Mable arrived and assisted in placing the offender on the floor. Once the offender was on the ground[,] he still had a grasp on officer Cantwell's hair and refused to let go and place his hands behind his back. Officer Cantwell struck the offender with a closed fist in his torso area. Sgt. Sweat also [struck] Offender Adams in his lower back and leg area prior to him releasing his hold on officer Cantwell. [Captain] Bustos, Michael, Sergeant Randolph, Joshua arrived and assisted in placing the offender in hand restraints. Correctional Officer III Johnson, Chase and Correctional Officer III Finch, Jeremy arrived and were instructed to clear the dayroom of all offenders. Once the area was cleared[,] Officer Finch and Officer Johnson were ordered to escort offender Adams to 12 building. Correctional Officer III Okolo, Clifford arrived with the video camera and began video documentation. Sergeant Rimes, Gabriella began narrating the use of force. The offender was escorted to 12 building B pod 23 cell. The offender was not taken to medical due to his aggressive behavior towards staff. Once in 12 building B pod 23 cell Licensed Vocational Nurse (LVN) Griffin, James conducted a use of force screening noting redness [] to both cheeks and state that the offender would need to be taken to medical at a later time to have a medical screening completed. At that time[,] Sgt. Rimes asked the offender if he had any injuries and the offender had complained of injuries to his chin and face. Sgt. Rimes then read and gave the offender a use of force participant form, Sgt. Rimes instructed the camera off and terminated the use of force. Please know that Sergeant Rimes was able to locate a digital camera and take still photos of Offender Adams at a later time.

(Dkt. #55, pg. id. #435.)  Sergeant Afun provided a written witness/participant statement concerning the force incident, which reads as follows and further clarifies what occurred:

On 10-25-2019 at approximately 1122 hours and at 3 Building C Pod 58 Cell, I Sergeant Victor Afun responded to an Incident Command System (ICS) with Officer Brandi Davis COV that was initiated by Officer Ashlee Cantwell COIII. Upon my arrival, Offender Alex Adams TDCJ Number 01181239 was standing in the hallway to the cell door and was refusing to respond and act on orders being given by Officer Cantwell. The offender was very aggressive hence I ordered the offender several times to turn around and submit to the application of hand restraints but the said offender refused to comply and obey my orders. I at this time held the offender by his left arm against the door frame. The offender became more agitated. The offender pulled away from my grips. At this time, Officers Davis and Cantwell and myself attempted to place the offender on the ground to gain control of him for his own safety and that of ours. The offender was very resistive of our actions and became very combative. Sergeant Mable Sweat arrived on scene at this time as staff subdued the offender and placed him on the ground gaining control of him. More staff arrived on scene as the offender became less combative, I was relieved of [sic] and I reported to the unit infirmary where I received use of force screening with no injuries being noted. I then resumed my normal duties. Let it be known that Offender Adams struck Officer Cantwell and Davis in the face area.

(Dkt. #55, pg. id. #441). Finally, Defendant Cantwell provided a written participant statement as well, which reads as follows:

> On 10-25-19 at 1122 am I was informing offender Adams #01181239 that he needed to move. S/O was agitated because he had been placed in G4 custody. I told S/O to shut his cell door to pack his property and he would not do so. I walked up to the Z Row to his cell and ordered the offender move out of the cell doorway. The offender was ordered several times to move out of the doorway and did not do so. I grabbed S/O arm to get him to leave the doorway and he still not move. Sergeant Afun, Victor and Officer Davis, Brandi COV arrived on scene and Sft. Afun told offender Adams to turn around and submit to hand restraints and offender Adams refused to do so. We proceeded to use the necessary amount of force to place hand restraints on offender Adams. S/O then became assaultive and began to hit myself and Officer Davis and Sergeant Afun. While assisting to place S/O on the ground, he grabbed my hair and I struck him three times in the torso to get him to let go. Once the offender released my hair I assisted in restraining the offender on the ground until adequate staff arrived. I was then told to exit the cell.

*Id.* at pg. id. #444-45. The use-of-force Report includes other witness statements, which mirror these three narratives and summaries. The Report also includes Adams's offender participant statement, which reflects that he refused to sign and provide a written statement about the incident. *Id.* at pg. id. #452.

Additionally, the Report includes injury documentation. Relevant to the remaining claim here, the summary judgment evidence indicates that prison officials did not perform a medical screening immediately on Adams—as Nurse Griffin determined that he was a threat to staff at the time. The nurse observed that Adams was ambulatory, complaining of pain/injury to his face, and that an injury to his face was visible. *Id.* at pg. id. #473.  Nurse Griffin noted that "no immediate medical treatment [was] needed" at that time and described Adams as having "minor redness to both sides of face, (Dkt. #55, pg. id. #474).

Cantwell was also examined after the use of force. She complained of injury to her eye, neck, and head. *Id.* at pg. id. #461. Nurse Hammond characterized Cantwell's injuries as "serious," noting injuries were present to her face, head, and neck: injuries to the right side of her face and

eye, swelling, discoloration to her right cheekbone, and redness. Cantwell was provided an ice pack and advised to proceed to her PCP (Primary Care Physician) for further treatment. The records further illustrate that Cantwell "was taken to PRMC [Palestine Regional Medical Center] and given a C.T. scan to rule out serious head trauma." *Id*. at pg. id. #462; 475-477.

The Report includes a TDCJ "Preliminary Investigation Report," which was commenced on the same day of the incident. The investigation report shows that when asked about the incident, Adam remarked "I was trying to kill that b****." *Id*. at pg. id. #476.

### 2. Surveillance Video

The video contained in the summary judgment evidence, dated October 25, 2019, is a surveillance video from a camera that appears to be affixed to the wall of a dayroom within the Michael Unit—facing three floors of cells. On the second floor, to the left, is cell number 58— which was Adams's cell during the incident. The video begins with many prisoners on the first floor of the dayroom conversing and watching television, with Officer Cantwell on the first floor standing to the left. Adams walks in and out of his cell, cell number 58, and closes the cell door at some point. He begins speaking to someone on the first floor as he stands above on the second floor in front of his cell; he continues to do so, and the camera shows him apparently yelling down to the first floor at Cantwell. Adams walks in and out of his cell a few times, makes hand/arm gestures toward the first floor, and then proceeds to throw a white article of clothing from the second floor to the first floor in an aggressive manner. *See* Surveillance video at 11:10:31. He then moves back into his cell and begins to tie his shoes; moments later, he emerges from his cell and again apparently yells from the second floor down to the first-floor dayroom, at which point Defendant Cantwell walks up the stairs.

6

Once Cantwell arrives on the second floor, Adams walks towards her. He starts speaking to her and makes a few arm gestures. They walk back to Adams's cell, number 58, and stand right in front of the cell door—which remains open. The video shows Adams arguing with Cantwell, continuing to employ hand gestures. The conversation appears aggressive, as Adams gets close to her face as he speaks to her. The video demonstrates that Adams, Cantwell, and an unidentified prisoner arguing. At a few times during the apparent arguing, the video shows Adams with his arms crossed. The "conversation" continues, and Adams begins to lean—arms crossed—on the door of his cell. Cantwell grabs his right forearm arm, *see* 11:13:14, and communicates something over her radio.

Two more officers arrive in the first-floor dayroom and immediately climb the stairs to the second floor. Moments later, both additional officers and Cantwell are standing in front of the cell, with Adams standing in front of the cell door. A conversation ensues—and Adams remains fixed leaning on the side of the cell door. One of the officers appears to communicate on the radio. Sergeant Afun speaks to Adams while holding what appears to be hand restraints; moments later, the video depicts Adams pulling away from Sergeant Afun—at which point all four individuals enter the cell. *See* Surveillance Video at 11:15:01-02. A close viewing of the video shows Sergeant Afun (1) ducking his head, 11:15.01.532, (2) trying to maintain his balance, 11:15.01.632, and (3) moving his left arm, at 11:15.01.732. In totality and in rapid succession, the surveillance video shows Sergeant Afun attempting to get Adams to place his hands behind his back, but Adams pulls away—thereby pulling Sergeant Afun into his cell.

Inside the cell, the video shows Adams standing up—resisting officers attempts to place him on the ground. In fact, the video depicts Adams grabbing and pulling a white sheet from the wall. *See id.* at 11:15:09-10. The confrontation and struggles continues as the sheet falls to the

7

ground; the video depicts Adams forcefully resisting an officer. *Id*. at 11:15:13. An additional officer then arrives, 11:15:16; he walks into the cell and walks around Adams who is now on the floor to assist the other officers attempting to place hand restraints on Adams. *See id*. at 11:15:33. Adams continues to resist, and an officer strikes him. Another officer arrives to the cell to assist, and enters the cell and kneels. The struggle continues and another officer arrives, speaks to them in the cell, and then leaves. Several other officers eventually arrive, and the video shows Cantwell exiting the cell. An officer is visibly recording as the surveillance video shows officers raising Adams to his feet, and he is now in hand restraints. Adams emerges from the cell and is escorted out by two officers.

Review of this video shows that it comports with the accounts contained in the TDCJ Use-of-Force Report. Equally significant, the video clearly contradicts Adams's allegations in his complaints that Defendant Cantwell "pushed him." Rather, the surveillance video shows that this "push" is actually Adams pulling away from Sergeant Afun, consistent with the Use-of-Force Report, at which point Sergeant Afun is pulled inside Adams's cell.

## V. Legal Standards

A court shall grant summary judgment only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P.  In determining whether there is a genuine dispute of a material fact, the court must examine the evidence and inferences drawn therefrom in the light most favorable to the nonmoving party.  *See S.E.C. v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1994). Summary judgment is appropriate "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."  *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal citations omitted).

The United States Court of Appeals for the Fifth Circuit has held that summary judgment disposition is inappropriate if the evidence before the court, viewed as a whole, could lead to different factual findings and conclusions. *See Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir. 1987). It is not the function of the trial judge—in ruling on a motion for summary judgment—to weigh the evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence. *Id*. at 567 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

In examining video evidence, the Fifth Circuit has stated that it "assign[s] greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *See Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (citing *Scott v. Harris*, 550 U.S. 372, 381 (2007) (the Court of Appeals need not rely on a plaintiff's description of the facts wherein the record discredits such description but should instead consider "the facts in the light depicted by the videotape.")); *see also Waddleton v. Rodriguez*, 750 F. App'x 248, 254 (5th Cir. 2018) (unpublished) ("This court will not adopt facts that are clearly contradicted by the video such as Waddleton's denial that he acted belligerently or resisted the officers.").

## VI. Discussion and Analysis

A review of the summary judgment evidence, viewed in the light most favorable Adams, shows that the evidence before the Court could not lead to different factual findings and conclusions. In other words, summary judgment in favor of Cantwell is appropriate in this case.

### A. Excessive Force

It is well-established that the use of excessive physical force against a prisoner may constitute cruel and unusual punishment. *See Hudson v. McMillian*, 503 U.S. 1, 4 (1992). Because prison officials, when confronted with prison disturbances, have the difficult job of balancing the need to maintain and restore discipline, the core question in determining whether the force used

against an inmate was applied in a good-faith effort to maintain or restore discipline inside the prison or, conversely, whether the force was applied maliciously and sadistically, for the very purpose of causing harm.  *Id*. at 7; *see also Whitley v. Albers*, 475 U.S. 312, 320 (1986) ("But, in making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used.").

With those concerns at the forefront, the Supreme Court held that in determining whether a prison official acted maliciously or sadistically to cause an unnecessary and wanton infliction of pain, courts should consider: (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response.  *Hudson*, 503 U.S. at 7; *see also Baldwin v. Stadler*, 137 F.3d 836, 839 (5th Cir. 1998).  Each factor is neither exclusive nor determinative, as each case must be judged on its own facts.  *Baldwin*, 137 F.3d at 839.

As mentioned, Adams maintains that he was "pushed in the cell and beaten," suffering injuries "beyond first aid." He asserts that he suffered a broken tooth, a cut under his chin, and "a lot of nerve pain" in his face. Finally, he insists that the surveillance video shows that he "did nothing wrong" and that staff started the entire problem. A review of the summary judgment evidence, however, shows that the *Hudson* factors ultimately favor Cantwell.

### 1. Extent of the Injury Suffered

The first *Hudson* factor is the extent of the injury suffered. 42 U.S.C. § 1997(e), enacted as part of the Prison Litigation Reform Act (PLRA), provides: "No Federal civil action may be

brought by a prisoner confined in a jail, prison or other correctional facility, for mental or emotional injury suffered while in custody <u>without a prior showing of physical injury</u> . . ." (emphasis supplied). While section 1997(e) does not specifically define what constitutes a "physical injury," both the United States Supreme Court and the Fifth Circuit have provided guidance after the ruling in *Hudson*.

In *Wilkins v. Gaddy*, 559 U.S. 34 (2010), the Supreme Court reversed the Fourth Circuit's affirmance of a district court's *sua sponte* dismissal of a prisoner's complaint for excessive force based on *de minimis* injuries. There, the prisoner-plaintiff alleged that a guard "snatched [him] off the ground, slammed him to the concrete floor" and "then proceeded to punch, kick, knee, and choke Wilkins." *Wilkins*, 559 U.S. at 35. As a result of the force employed, Wilkins stated that he suffered a bruised heel, lower back pain, increased blood pressure, migraine headaches, dizziness, psychological trauma, and mental anguish. *Id*. As mentioned, the district court found those injuries *de minimis*, dismissed the case *sua sponte* for the failure to state a claim upon which relief can be granted, and the Fourth Circuit affirmed.

The Supreme Court found that the Fourth Circuit "strayed from the clear holding" of *Hudson*. *Id*. at 36. The Court found that the Fourth Circuit's holding amounted to, essentially, a requirement that the plaintiff demonstrate a significant injury in order to state a claim for excessive force—which ignores the "core judicial inquiry" of an excessive force analysis, which is whether the force was applied in a good-faith effort to restore discipline/order or maliciously and sadistically for the very purpose of causing harm. *Id*. at 36-37.

Importantly, however, the Supreme Court explained that "this is not to say that the absence of serious injury is irrelevant to the Eighth Amendment inquiry." *Id*. at 37. In other words, the absence of a serious injury is relevant to an excessive force inquiry under the Eighth Amendment.

*See Edwards v. Stuart*, 37 F. App'x 90, 2002 WL 1022015 *2 (5th Cir. 2002) (unpublished) ("Nonetheless, *de minimis* uses of force are excluded from constitutional recognition.") (citing *Hudson*, 503 U.S. at 9). Moreover, the Fifth Circuit has held that, in order to be actionable, the amount of force must be more than *de minimis*—provided that the force is not repugnant to the conscience of mankind—and the plaintiff need not show serious injury, but the extent of the injury may supply insight as to the amount of force applied. *Cowart v. Erwin*, 837 F.3d 445, 453 (5th Cir. 2016).

Necessarily, then, "[a]n inmate who complains of a push or shove that causes no discernable injury almost certainly fails to state a valid excessive force claim." *Wilkins*, 559 U.S. at 38 (internal quotations and citations omitted); *see also Jackson v. Culbertson*, 984 F.2d 699, 700 (5th Cir. 1993) (explaining that a prisoner need not show significant injury but must have suffered at least some injury); *Rankin v. Klevenhagen*, 5 F.3d 103, 108 (5th Cir. 1993) ("In cases post-*Hudson*, certainty some injury is still required.") (internal citations and quotations omitted). Significantly, "[w]here there was no injury, the use of physical force is considered *de minimis* and therefore 'not repugnant to the conscience of mankind' so as to implicate the federal constitution." *Jackson*, 984 F.2d at 700. The law in this circuit is clear: In order to state an Eighth Amendment claim, a prisoner must have "suffered at least some injury."  *Jackson*, 984 F.3d at 700; *see also Lee v. Wilson*, 237 F. App'x 965, 966 (5th Cir. 2007) (unpublished) (affirming the dismissal of a prisoner's excessive force claim, holding that the prisoner's split lip was a de minimis injury and the conduct was not repugnant to the conscience of mankind).

The Fifth Circuit has also held that where the objective factors of a prisoner's medical records show no evidence of any injuries consistent with the prisoner's allegations, the Court may conclude that the allegations are implausible. *See, e.g.*, *Wilburn v. Shane*, 193 F.3d 517 (5th Cir.

1999) ("It is implausible that the hospital would not have recorded the severe injuries Wilburn alleged he received.").

Here, medical records contained within the summary judgment evidence, viewed in light most favorable to Adams, shows that this factor weighs in favor of Adams.  Adams maintains that he suffered injuries in the form of a broken tooth, a cut under his chin, and "a lot of nerve pain" in his face—injuries that he characterizes as "beyond first aid." Defendant Cantwell argues, conversely, that Adams's injuries—redness to his cheeks, a 3-centimeter abrasion on his chin, and no active bleeding—are *de minimis* and not the type of injuries that are "repugnant to the conscience of mankind." Defendant Cantwell further insists that Adams's *de minimis* injuries do not defeat Cantwell's entitlement to qualified immunity.

Indeed, the summary judgment evidence reveals that Nurse Griffin examined Adams on October 25, 2019, after the force incident. He documented that Adams was ambulatory and complaining of injuries to his face—further observing that an injury was visible to his face, (Dkt. #55. pg. id. #473). However, the evidence indicates that Nurse Griffin explained Adams was unable to be treated and unable "to be seen in medical" because he was a security threat. Although his notations show that Nurse Griffin determined that Adams did not require immediate treatment given the security threat, further records related to any additional treatment provided to Adams after he was no longer deemed a security threat are not in the record before the Court. Defendant's summary judgment evidence contains a medical record dated September 23, 2019, (Dkt. #55, pg. id. #482), which is not related to his October 25, 2019, force incident.

Defendant Cantwell maintains that the security team determined that Adams would be seen for a full medical evaluation once Adams calmed down and it would be safe to escort him to the medical department from his cell. Adams insists that the summary judgment evidence is silent on

13

mental health and his "broken tooth." His contention is well-taken. Given the absence of further records, Cantwell's summary judgment evidence does not refute Adams's allegation that he suffered a broken tooth as a result the use of force. Accordingly, the first factor under *Hudson*— the extent of the injuries suffered—weighs in favor of Adams at the summary judgment stage.

Turning to Defendant Cantwell's injuries, the summary judgment evidence reveals that Defendant Cantwell suffered injuries to the right side of her face and eye, swelling, discoloration to her right cheekbone, and redness. Cantwell was treated for her injuries—as she was provided an ice pack and advised to proceed to her PCP (Primary Care Physician) for further treatment. The records further illustrate that Cantwell "was taken to PRMC [Palestine Regional Medical Center] and given a C.T. scan to rule out serious head trauma." *Id*. at pg. id. #462; 475-477.

While the records indicate that Defendant Cantwell suffered significant injuries as a result of this force incident, her injuries are inapplicable to the first *Hudson* factor, the extent of the injury suffered, which is analyzed to answer the question of whether unnecessary and wanton infliction of pain was used in violation of Adams's constitutional rights. That is not to say that Defendant Cantwell's injuries are irrelevant in this case; they simply are not relevant to the first *Hudson* factor. While this first factor weighs in favor of Adams, the remaining factors do not.

### 2. The Need for the Application of Force

The second factor is the need for the application of force. Adams asserts that he did nothing wrong and that—even though Sergeant Afun has never been a party in this lawsuit—his "altercation" was with Afun.

In *Waddleton*, plaintiff Marvin Waddleton was being escorted by prison officials out of the law library after having a dispute with the librarian. Waddleton asserted that he was being wrongly accused of misconduct, at which point he kicked the library and cursed the guards. When they

14

approached the hallway to 11 Building, Waddleton refused to enter and pushed back toward the officers. Waddleton's hands were cuffed in the front of his body. Officers explained that the failure to comply with orders would result in a use of force, but Waddleton continued to resist. According to the video, the court stated, "just as they pass through the chain gate to the 11 Building hallway, [Waddleton] pulls away from Sgt. Salinas, and Lt. Rodriguez orders Sgt. Salinas and Officer Olufolat to take Plaintiff to the ground." The district court concluded that there was no evidence force was used maliciously or sadistically for the very purpose of causing harm—further finding that the defendants were entitled to qualified immunity. *Waddleton*, 750 F. App'x at 252.

On appeal, the Fifth Circuit found that "the use of force was triggered by Waddleton's sudden movement away from the wall and towards the officers." *Waddleton*, 750 F. App'x at 254. Although the evidence showed the force incident resulted in injury, the Fifth Circuit determined that "as to the second and third [*Hudson*] factors, Waddleton's sudden movement created a need for the use of force and the relationship between the need for force and the amount of force used was appropriate." *Id.*

Similarly, in *McCoy v. Esquivel*, plaintiff McCoy told Officer Esquivel that he needed medical attention because he believed his blood sugar was low. Later that same morning, Officer Scott led McCoy to the medical department and then to disciplinary court. After a hearing, McCoy again asked to go to the medical department; medical personnel informed Officer Scott that they could not check McCoy's blood sugar because they did not have a machine at that time. Esquivel ordered McCoy to go to his cell. McCoy stated that he needed medical treatment and that the officers would have to carry him up the stairs, as he felt dizzy and faint. McCoy was leaning against a wall and Officer Scott let go of his arm. McCoy dropped down to the ground in a crouching position, and both McCoy and Esquivel later provided statements agreeing that Esquivel assumed

15

or perceived that McCoy's crouching movement was an attempt to pull away from the officers. Esquivel took McCoy to the floor, causing a head injury. 798 F. App'x 818, 819-20 (5th Cir. 2020) (Mem) (unpublished).

The Fifth Circuit affirmed the district court's entry of summary judgment for Esquivel. In doing so, the Fifth Circuit explicitly agreed with the district court's finding that Officer Esquivel's use of force was not unreasonable—giving weight to McCoy's refusals to comply with orders and his downward, crouching movement that both parties agreed was perceived as McCoy "pulling away" from officers. *Id.* at 820 ("[W]e agree with the district court that Esquivel's use of force was not unreasonable given McCoy's refusal to comply with orders and his downward movement."); *see also Poe v. TDCJ*, 306 F. App'x 866, 868 (5th Cir. 2009) (unpublished) (affirming district court summary-judgment dismissal, finding that plaintiff Poe failed to demonstrate a genuine issue of material fact concerning whether the need for force was excessive to the need or objectively unreasonable—highlighting that "Poe failed to obey orders 'to relinquish control' of the food slot" and that "Poe was warned that his failure to comply with orders to remove his arms from the slot would result in the use of chemical agent and a 'move team' . . . . but he refused to comply.").

Here, the surveillance video shows that Adams was visibly agitated even before Cantwell arrived on the second floor. The video depicts him appearing to yell down to the first floor and throwing an article of clothing over the railing. The use-of-force report indicates that Cantwell informed Adams that he needed to move to a different cell, to pack his things, and to move out of his cell. The surveillance video depicts Adams arguing with Cantwell, and Cantwell using her radio. The arguing persists even as additional officers arrive. A close inspection of the video illustrates an officer ducking his head, trying to maintain balance, and Adams pulling away as that

16

officer attempts to place hand restrains on him—thereby pulling that officer into his cell. The other officers immediately enter Adams's cell, and a visible struggle ensues—with Adams pulling a long white sheet down from the wall rather than comply with orders. The video shows absolutely no compliance by Adams.

Adams's defiance of multiple orders—coming on the heels of his being visibly agitated, yelling, and throwing an object minutes prior to the force incident—and his subsequent pulling away from an officer, causing that officer to be pulled inside the cell with him, indisputably created a need for the application of force. *See, e.g.*, *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984) (explaining that when a prisoner cannot be persuaded to comply with an order, some means must be used to compel compliance because discipline is necessary for the institution to function).

Some means of force is objectively necessary when an agitated prisoner places an officer's safety at risk by pulling him inside his cell. *See, e.g.*, *Jones v. Anderson*, 721 F. App'x 333, 334 (5th Cir. 2018) (unpublished) (finding no genuine issue of material fact that Anderson "did not employ excessive force" during a prison incident wherein "Anderson reasonably perceived Jones's actions to present a threat to Anderson's safety" and "his employment of force was necessary to restore discipline and mitigate such a threat.").

The entire video shows that it is unquestionable that some force was necessary to subdue Adams and ensure safety and security. Given Adams's belligerent behavior and continued refusal to comply with orders, the Court has determined that this second factor—the need for the application of force—weighs strongly in favor of Defendant Cantwell and against Plaintiff Adams.

To the extent that Adams maintains that he was "punched" during the incident, the Court notes that this claim is not determinative. An officer's using force, such as punching or striking a prisoner, as that prisoner is actively resisting and/or posing a clear threat to those officers does not

17

per se violate the Eighth Amendment. *See, e.g.*, *Johnson v. Evans*, 422 F. App'x 317, 318 (5th Cir. 2011) (unpublished) (affirming district court's conclusion that no excessive force occurred after recounting facts that an officer "punched Johnson in the face in order to negate the threat of physical harm."). While Adams may have been punched inside his cell during his struggle with officers, the competent summary judgment evidence illustrates that some means of force was necessary.

### 3. The Relationship Between the Need and the Amount of Force Used

The third *Hudson* factor to examine is the relationship between the need for force and the amount of force used. As mentioned, the summary judgment evidence, which includes a surveillance video, depicts Adams refusing multiple orders and disturbing the prison by throwing an article of clothing and apparent yelling. After Cantwell speaks with a visibly-agitated Adams, she uses her radio; once additional officers arrive, Sergeant Afun attempts to place hand restraints on Adams, who pulls away and pulls Sergeant Afun into his cell. The other officers, including Cantwell, immediately enter the cell within seconds—and a scuffle ensues.

While the surveillance video does not depict everything that occurred inside the cell, the summary judgment evidence in its entirety demonstrates that the amount of force used upon Adams was reasonably proportionate to the perceived threat and the need for the application of such force. In other words, even accepting Adams's claims as true that he was punched or kicked during the incident, the amount of forced used was reasonable in light of the need.

Adams was unrestrained, visibly agitated, and refused multiple orders prior to pulling Sergeant Afun into his cell and pulling a bedsheet down from the wall.  When Sergeant Afun attempts to place hand restraints on Adams and he then pulls away, necessarily pulling Sergeant Afun inside the cell, prison officials needed to act quickly and decisively. Given Adams's behavior

18

and his resulting non-emergent injuries, the summary judgment evidence shows that the amount of force used was proportionate to the need for force. Accordingly, the third *Hudson* factor weighs in favor of Cantwell.

### 4. The Threat Reasonably Perceived

The fourth *Hudson* factor concerns the threat reasonably perceived by the responsible officials. The surveillance video shows an agitated, upset Adams. Additional summary judgment evidence reveals that Adams openly defied multiple orders immediately preceding the use of force—and the video illustrates Adams pulling away from an officer (resulting in the officer's being pulled into Adams's cell along with him), a struggle to place him on the floor, and also his pulling a bedsheet during a struggle inside the cell rather than comply with orders.

All of Adams's actions plainly posed a threat to the officers and the security of the institution, as open defiance of orders in a prison setting posses a significant security problem. *See Davis v. Cannon*, 91 F. App'x 327, 329 (5th Cir. 2004) (unpublished) ("Defendants' actions were a continuation of their good faith effort to maintain or restore discipline following Davis's repeated refusal to obey Steele's orders."); *see also Hamer v. Jones*, 364 F. App'x 119, 124 (5th Cir. 2010) (per curiam) (unpublished) (finding no excessive force where it was undisputed that the plaintiff created a disturbance and that the force used against him was in response to that disturbance."). This factor weighs heavily in favor of Cantwell. *See Meadows v. Gibson*, 855 F. Supp. 223, 225 (W.D. TN 1994) ("Prisoners may not pick and choose which prison rules they obey.").

The Court has thus determined that factors three and four weigh heavily in favor of Cantwell—as the evidence shows that the use of force "was applied in a good-faith effort to maintain or restore discipline." *See Waddleton*, 750 F. App'x at 254 ("Salinas, Rodriguez, and the unknown officer had to make real-time evaluation of a potential threat. Prior to this action,

Waddleton had kicked open a door, been verbally belligerent, and stated that he was 'pissed off.'") (internal citation omitted).

### 5. Efforts Made to Temper Severity of a Forceful Response

The final *Hudson* factor concerns the efforts made to temper the severity of a forceful response. The summary judgment evidence shows that Adams defied multiple orders and was visibly agitated and throwing objects. The surveillance video shows Cantwell and other officers conversing with Adams prior to the employment of force. As mentioned, however, the surveillance video does not depict everything that occurred inside the cell. Therefore, this fifth *Hudson* factor is inconclusive—weighing neither in favor of Plaintiff Adams nor Defendant Cantwell.

### 6. The Core Judicial Inquiry

The Court has determined that the majority of the *Hudson* factors favor Defendant Cantwell. But the analysis does not end with the *Hudson* factors. The Court must resolve the central question for any excessive force claim: Whether the force was used in a good faith effort to restore discipline or used maliciously or sadistically for the very purpose of causing harm. *Hudson*, 503 U.S. at 7.

Federal courts have defined acting "maliciously" as to intentionally commit a wrongful act without just cause or excuse—with an intent to inflict injury or under circumstances that show an evil intent. "Sadistically" means to inflict pain upon another for one's own pleasure. *See Douglas v. Owens*, 50 F.3d 1226, 1232-33 & n.13 (3rd Cir. 1995); *Parkus v. Delo*, 135 F.3d 1232, 1234 (8th Cir. 1998). Both these definitions are also used in the Fifth Circuit's Pattern Jury Instructions for Civil Cases. (5th Cir. Pattern Jury Inst., 2014 ed., sec. 10.7, pg. 104-05).

The competent summary judgment evidence, which includes the surveillance video, clearly shows that Defendant Cantwell did not act maliciously or sadistically for the very purpose of

causing harm. Rather, the summary judgment evidence reveals that Cantwell was faced with an agitated, recalcitrant prisoner who refused to comply with multiple orders. After Cantwell communicated via radio, she was faced with a prisoner who pulled away from another officer in front of her—pulling that officer inside Adams's cell with him and necessarily causing a significant safety and security risk. Cantwell entered his cell to employ force in an effort to restore discipline. Once inside the cell, Adams pulls a sheet down from the wall of his cell—and proceeds to pull her hair during the struggle. While the video does not show Adams pulling Cantwell's hair, his statement that "her hair is not even seen being needed to be redone," does not genuinely refute that he—in fact—pulled her hair. Having hair pulled does not necessarily require a new hairdo.

Adams ignores that he continued to struggle with officers, continued to disobey orders, and pulled down a sheet during the scuffle. As mentioned, additional officers had to arrive and assist three others who were attempting to subdue Adams inside his cell. The competent summary judgment evidence does not reveal a constitutional violation. Instead, the evidence illustrates a recalcitrant prisoner who disobeyed orders and indicates that he pulled the Defendant's hair and would not let go. Defendant Cantwell's use of force on Adams was not malicious and sadistic for the very purpose of causing him harm; the force was employed in a good faith effort to restore and maintain discipline and to free herself from his grip. *See Jones*, 721 F. App'x 333, 335-36 (determining that correctional officer did not employ excessive force when subduing prisoner who "repeatedly refused to obey [the officer's] orders and acted agitated and argumentative.").

The absence of malicious or sadistic action for the purpose of causing harm results in a meritless claim of excessive force. *See, e.g.*, *Waddleton*, 750 F. App'x at 254-55 (finding no excessive force wherein restrained prisoner continued to be uncooperative and resisting).  In fact, the Fifth Circuit has found no excessive force occurred—as it determined that there was no

evidence of malicious or sadistic action—where a prisoner was belligerent and pulled away when an officer grasped his arm. *See Williams v. Valenti*, 432 F. App'x 298, 302 (5th Cir. 2011) (unpublished) ("On this record, we conclude that there is no evidence that Valenti used force maliciously and sadistically for the purpose of causing harm.").

Finally, the fact that Adams suffered a serious injury—a broken tooth, for example—does not alter the Court's analysis. As mentioned, the seriousness of an injury may be considered in determining whether the use of force could plausibly have been considered necessary or, instead, evinced wantonness and unjustified infliction of harm. *See Whitley*, 475 U.S. at 321. In so finding, however, the Supreme Court held that the shooting of a prisoner in the leg—clearly a serious injury—was not an Eighth Amendment violation because it was done in an effort to restore discipline rather than through a "wanton willingness to inflict unjustified suffering." *Id*. at 325.

Here, a review of the surveillance video demonstrates that Defendant Cantwell's actions were an attempt to restore discipline and order—order breached by Adams's own refusals to comply with orders, his resistance, and his overwhelmingly recalcitrant behavior. Accordingly, the quantum of Adams's injury does not, itself, demonstrate a constitutional violation.

## B. Qualified Immunity

Even if the evidence would support a finding of a constitutional violation—which it does not—Defendant Cantwell is entitled to qualified immunity. The doctrine of qualified immunity shields officers from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See City of Tahlequah, Okla. v. Bond*, 142 S.Ct. 9, 11 (2021). The Supreme Court has declared that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id*. (internal citations omitted). As Cantwell explains, the usual summary judgment burden of proof is

altered in the case of a qualified immunity defense. *See Gates v. Tex. Dep't of Protective & Reg. Servs.*, 537 F.3d 404, 419 (5th Cir. 2008).

Specifically, here, Cantwell need only plead good faith, which shifts the burden to Adams—who then must rebut the defense by establishing that her conduct violated clearly established law. *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005). Adams cannot rebut the defense through conclusory allegations, and his assertions must show genuine issues of material fact regarding Cantwell's conduct. *Id.*; *see also Wyatt v. Fletcher*, 718 F.3d 496, 510 n.19 (5th Cir. 2013) ("When a public official, like Newell and Fletcher here, pleads good faith, 'the burden [shifts] to the plaintiff, who must rebut the defense by establishing that the officer's allegedly wrongful conduct violated clearly established law.") (citing *Michalik*, 422 F.3d at 262); *Tucker v. City of Shreveport*, 998 F.3d 165, 173 (5th Cir. 2021) ("To overcome the qualified immunity defense, the plaintiff has the burden to point out clearly established law and also bears the burden of raising a fact issue as to its violation.") (internal citations and quotations omitted).

The qualified immunity analysis comprises two components: (1) "whether a plaintiff alleges or shows the violation of a constitutional or statutory right; and (2) whether the right in question was clearly established at the time of the alleged violation." *Ramirez v. Guadarrama*, 844 F. App'x 710, 713 (5th Cir. 2021) (unpublished); *see also Williams v. City of Yazoo, Miss.*, 2022 WL 2762707, at *4 (5th Cir. July 15, 2022) (unpublished).

If a plaintiff succeeds on the first prong, the Court then proceeds to step two: whether the official's actions "could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). In order for a right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable officials would understand that what he is doing violates that right." *Ramirez*, 844 F. App'x at 713

(citing *Anderson*, 483 U.S. at 640). This second prong "turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *See Amos v. Jefferson*, 861 F. App'x 596, 603 (5th Cir. 2021) (unpublished).

Both the Supreme Court and the Fifth Circuit have cautioned federal courts regarding the doctrine of qualified immunity in cases of alleged excessive force, as cases of excessive force are necessarily fact intensive. *See Morrow*, 917 F.3d at 876 (explaining that "overcoming qualified immunity is especially difficult in excessive-force cases," in part, because such claims turn on "split-second decisions"); *Amos*, 861 F. App'x at 604 (explaining that "prison officials are accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").

Here, a rigorous analysis of the *Hudson* factors reveals that Adams has failed to show a constitutional violation for excessive force. The summary judgment evidence, viewed in light most favorable to Adams, does not show that a constitutional violation occurred or that Defendant Cantwell acted unreasonably. In short, the summary judgment evidence illustrates that Adams was agitated about having to move to another cell, became belligerent by apparently yelling and throwing an article of clothing, and would not comply with efforts to reason with him before Cantwell communicated something over her radio.

Once assistance arrived, Sergeant Afun attempted to place hand restraints on Adams, who then pulled away from the attempt—thereby pulling Sergeant Afun into his cell, at which point a struggle ensues. To the extent that Adams was struck, it was in an attempt to preserve internal order, discipline, and security—all of which were breached by Adams during his recalcitrant behavior. Because the *Hudson* favors do not favor Adams, he has not shown a constitutional

24

violation and the Court need not analyze whether the allegedly violated right was clearly established. Defendant Cantwell is entitled to qualified immunity.

**VII. Conclusion**

A review of the pleadings and the competent summary judgment evidence reveals that there are no genuine disputes of material fact, and that Defendant Cantwell is entitled to a judgment as a matter of law. Her motion for summary judgment should be granted, and Adams's should be denied.

<u>RECOMMENDATION</u>

Accordingly, it is recommended that Defendant Cantwell's motion for summary judgment, (Dkt. #55), be granted. The Court further recommends that Plaintiff's motion for summary judgment, (Dkt. #61), be denied. Because Defendant Cantwell is the last remaining defendant in this lawsuit, the Court recommends that this civil action be dismissed.

Within fourteen (14) days after receipt of the Magistrate Judge's Report, any party may serve and file written objections to the findings and recommendations contained in the Report.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

So ORDERED and SIGNED this 2nd day of August, 2022.

K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE

25